The United States Court of the Ninth Circuit is now in session. Good morning, everyone, and welcome to the Ninth Circuit. We'll take the cases in the order on the day sheet. The first case is Jose Napoleon Alfaro Enriquez v. Garland. That's submitted.  Garland. That's submitted. The next is Maximiliano Guevara de Vila v. Garland. That's submitted. And the first case for argument is Another Planet Entertainment v. Vigilant Insurance Company. Good morning, Your Honors. May it please the Court, Kirk Passage for Another Planet. I'd like to reserve two minutes for rebuttal. Please watch the clock. Absolutely. Thank you. You know, I asked myself today, recognizing the landscape that we deal with, why we're here. I'm obviously aware that nationally, if you believe the University of Penn, Jip Carey Law School reporter, 51% of the decisions nationally have ruled against insurance. 26% have been dismissed voluntarily. So against a national track record of about 77% of the cases going against our position, I recognize that burden. I also recognize this Court's decisions in a variety of COVID coverage cases, including Saline, which I argued and lost. And I recognize the split in California cases. If the controlling California appellate decision were United Talent Agency, frankly, I wouldn't be here today. So I recognize my task is to explain to you why we should not follow United Talent Agency. In fairness, I was UTA's counsel. So I know that case well, and I'm going to tell you now why I think this case is different. And my view on that's been reinforced by the California Supreme Court's decision three weeks ago in Yahoo. And I think that decision and the Marina Pacific decision, which came out after the United Talent Agency decision, I think those are the two key decisions. Now, we submitted supplemental authorities, including the Huntington Ingalls decision out of Vermont. I recognize that's the only state Supreme Court decision going our way. I was counsel in that case as well. Did it go your way based on an allegation that the virus is present on the premises? Yes, we did allege, similarly to what we alleged here, that the virus, the difference was Huntington Ingalls was an essential element. It was a government contractor, the largest shipbuilder in the world. It had to stay open. I would concede that we argued there and put in fact, showing that there are 8,000 COVID cases in their shipyards. I do not have obviously the same allegations here, nor could I make those allegations here for two reasons. Number one, let's please keep in mind that according to the Centers for Disease Control, concert venues were one of the highest spreading sources for COVID. One of the most dangerous places to be is an indoor concert venue, like those operated by Another Planet. Right, so is your allegation that, because your allegations are different than the allegations in Marina Pacific, right? Well, they are to an extent. I think your allegations are on information and belief, right, that our virus was present or it would have been, but for your efforts. And I think in Marina Pacific, I'll get out of your way in just a second. I think my understanding, please correct me if I'm wrong, is that in Marina Pacific, the allegation was that, you know, there had actually been people present ill on the premises. Does that matter? It could matter, but I'll tell you why I don't think it matters here. Okay. Here's what we do know. The virus didn't hit everywhere at one time. Obviously, different places got closure orders at different times when they believed the virus was in the community and there was community spread. Terms that various orders used were the virus is ubiquitous in its presence. We know that you couldn't test for the presence of the virus in March and April of 2020. There was simply no testing available that would pick it up. We know that according to the data which we cite in the complaint, somewhere around 50% of the cases are communicated through people with no symptoms. So when you had no testing and no symptoms, we believe statistically if given the chance, we could prove that statistically the virus was present before we closed. Now, we allege that the virus either was present or that it would have been present. And that's an important distinction which frankly, none of the cases really deal with. And the reason I say that is the mitigation doctrine. Mitigation is not addressed in cases really like Mud Pie or Saline, Marina Pacifica, United Talent Agency, any of those. But if you look at AIU which recognize that when you have government cleanup orders, that could be a form of mitigation. That's the California Supreme Court. So our position would be we should be able to prove which I think science would entitle us to prove and would prove that the virus was present before we were closed. That as it spread, it impacted the number of people that would come to our premises because of their fear about the virus. And then once we got closure orders, that was mitigation. We closed and the government directed us to close. So was the loss, I think opposing counsel's argument is the loss was caused by the closure orders, not by the potential presence of the virus on the contents of the venue. I recognize their argument. That was an argument not really briefed by anybody below because that invokes the doctrine of efficient proximate causation. What's the cause that's most directly responsible?  Which set the other in motion. Yes, I mean, that's exactly right. So to me, the closure orders are the second step in the process. Now, the other argument that Mr. It wasn't briefed below, was it? In this case? No, it was not an issue that the court addressed. Could you back up a second about what you were just speaking of regarding the presence of the virus on the premises? The thing that seems different to me about this complaint is the allegation that contrary to earlier in the epidemic where some courts have reasons where you can just wipe it off, you're alleging something scientifically different. Absolutely. We're not in a position to prejudge. No, and that's why that's why. Outlandish, but it's not what I do for a living. So you have this allegation. Yes. Right, that there's direct physical loss because the virus somehow permeated. And one thing that causes me concern about that theory is that it seems to be if that's true, it would certainly mean that there's going to be a different analysis depending on the type of premises. You're talking about concert venues. I think also about office space, right? There are some office spaces. The primary business losses for us come from the concert venues, obviously. So just hypothetically for a minute, I'm concerned about the number of cases that would be impacted by this. So if we had somebody standing at the podium representing a grocer or something, some kind of retailer where the virus was such that they had to really throw out inventory, then it seems to me we'd have a really different problem. And so I'm concerned about a precedent that could be overly broad before the California Supreme Court has ruled on this. Well, and the curious question— Should I be? Should I be? I think you should be concerned. I agree with you. And I'm going to have her both counsel. No, I think you should be concerned because— But you're a concert venue person. We're a concert venue is what— You're not alleging here that—forgive me for interrupting so much. You're not alleging here that you had to throw out any property like in Marina Pacific, are you? Well, now this is where it comes down to it. We would have to do disinfection measures, cleaning measures, partitions, things like that, which we— See those allegations, though, and the complaint that you took those steps. Well, we do allege, and in fact, we address specifically the notion of cleaning, whether it would be temporary or not in terms of the persistence. And we did reference that we would have to take steps to do that. But not that you have, in fact, taken steps. Or that there was— Ultimately, because we were closed—I mean, that's one of the issues here. With no people, there's no virus. Now, we know scientifically that the virus really isn't a problem in outdoor air. You're not going to—contrary to what people thought at the start, you're not going to catch the virus walking down the street. It's when you're inside enclosed space when the virus is present. And that's why we cited Armstrong. And I recognize United Talent Agency addressed Armstrong. But with all due respect to that court, it missed a key component of Armstrong. Armstrong was damage or destruction of property. The United Talent Agency court focused on the loss of use of property. But if you look at Armstrong, it specifically discusses an entire section about how the presence of asbestos in air is damage to property. And here, a difference from United Talent Agency, a difference from most of the cases out there, is we have a package policy that has that microorganism virus exclusion in the liability side, which means these folks clearly know how to put that exclusion in. And that's why Yahoo becomes important. Because if you look at the Yahoo, what the Supreme Court did in Yahoo three weeks ago was looked at various pieces in the policy. It looked at the fact that an endorsement removes an exclusion. We have an endorsement adding an exclusion. It looked at different coverage parts of the policy and said, you looked at the policy as a whole. Now, I'm not going to argue that the absence of a virus exclusion creates coverage. But what I think makes this case very different than most cases out there is we specifically allege what vigilance knowledge was. We specifically allege 50 years of case law that says microscopic things inside the airspace of a building constitute property damage. We allege that Vigilant had available to it the insurance library resources detailing the problems with pandemics. We allege that in 2017 in their annual report, Vigilant warned its shareholders that if there was a pandemic, its payouts could have a major material financial impact on it. Now, that's extrinsic evidence, I agree. Under Pacific Gas and Electric, which we cite, the district court should have at least provisionally considered that evidence and given us the opportunity to develop it. Under Yahoo, that's the context that informs whether our expectations were reasonable or not. Now, I would submit whether this virus causes damage like they allege or not. You have to look at what our reasonable expectations were. Cases like Huntington Ingalls, Hungarian from the Pennsylvania Superior Court, their intermediate court of appeal, they all recognize that the virus can be physical damage and it can be covered. What was the damage here? I guess I'm losing. It's the presence of the virus. You're saying the presence of the virus, which you allege could have been there by itself without more, is the damage. Is that your position? Yes, because that's what AIU says, the California Supreme Court, about microscopic pollutants. That's what Armstrong said about asbestos fibers in the airspace. What loss did your client incur due to that damage? The loss we incurred is because we had to close. If you accept... Closed because of the damage to the furniture or whatever the items were on the premises. Well, it's a couple of things. We have alleged that the virus lands on surfaces and attaches to surfaces. That's different than UTA. The UTA allegations were much less. But in Marina Pacific, they said they were required to close as a result of the virus and they incurred expenses to remediate. And you did not allege, the company did not allege, that they closed as a result of the virus as opposed to the closure orders or that you incurred expenses to remediate. Well, we have to pick these pieces of the coverage in different parts. You would have physical destruction of property. If a car hit a building, that would be one coverage. If we had extra expense incurred to remediate, that's the second type of thing that's covered. And if we have some sort of physical damage that causes economic loss, like we have to close, that's the third type of coverage. That third type of coverage is what we're talking about here. And in fairness, that's what most of the decisions have addressed. The difference for us is we have put in a lot of the science. Twenty years ago, I would have been criticized for doing evidentiary pleading as opposed to what's happened here. But it's clear to us that we have to allege the science and we've alleged the science. I think the science – the reason we cited the Baylor case, recognizing it's a trial court, it's a jury decision, is to say, if we're allowed the opportunity to present our evidence, we can prove the required physical alteration. We can prove that economic loss flows from that. That's one of the first cases in the world to go to trial where the insured was permitted that opportunity. That's what we are asking for is that same opportunity. Now, if you talk about the physical nature, we can show, and we did allege, which is what's important here, that the virus in the air alters the air and the airspace. If you think – Did you allege, other than on information and belief, that the virus was present in your air? We said it was either present or would have been present, but for mitigation. Either or. I personally think if we're proving at trial, we – Excuse me, but that's different. I know. I mean, I look carefully at that. And that's bothering me, so I want to give you an opportunity, sir. That's different than in Marina Pacific, right, where they allege they were – It wasn't on information and belief. They alleged that there were human beings on the premises who had been, I think, ill. And so should I be concerned about that? It's a fair concern, absolutely. But I think the important factor here for us is because Marina Pacific and UTA did not get into the mitigation doctrine, it's very clear that if we had been open, the virus would have been present. That's a scientific certainty. And the argument that Mr. Hacker makes, which I respect, is, well, this is all about protecting people. Of course it's all about protecting people. But you have the government – you have an executive order out of Nevada that recognizes that the virus physically damages property. Now, the district court's analysis of that was I don't know what's going on in the halls of the executive branch in Nevada. That's not an answer. And it doesn't say our allegation is not reasonably plausible. The other point I would note here is if you think about asbestos in Armstrong, asbestos was wonderful at doing exactly what it was supposed to do. It was a danger to people inside a building. That's why you had to remove it. And the California appellate court said that's property damage. Our circumstance is the same except SARS-CoV-2 is more dangerous than asbestos. You just have a few seconds left. You want to save them for rebuild? We'll hear from the other side. Good morning, Your Honors. May it please the court, John Hacker for Vigilant. I appreciate Mr. Passage's concessions and effort to sort of level set and admissions about the overwhelming authority against him. And I'd like to sort of further level set with respect to California law. Overwhelming evidence. I've been following these cases pretty closely and not a lot of them have alleged virus present on the premises. What's the scorecard for that category of cases? Well, so I don't have, you know, the exact scorecard of all the cases everywhere, but UTA involved a virus on the premises for sure. What the court relied upon. The allegation was that the virus was present in UTA, but that's not what the court relied upon. And Marina Pacific goes out of its way to distinguish itself from UTA, right? Should we be concerned that there are two intermediate courts that have come down differently on this? So I think it's more than two. That's what I was thinking. UTA, I think, does, it addresses and rejects the argument that physical presence creates the kind of distinct, demonstrable physical alteration that this court and California courts have required. So UTA is a physical presence case that says the allegations here are not enough. As Mr. Passage... Well, UTA talks about the ability to wipe off the virus. This complaint is a scientific, it does include quite a number of scientific allegations about, you know, why we should perhaps conclude or allow an opportunity to prove that the virus altered the property. Can I push back on that? Because if you look at the allegations, the science, the so-called science that's cited, there's no science in this complaint alleging or establishing that the presence of the virus sitting on a surface physically alters the property in any way. Of course, it doesn't establish it. I'm just positing that they allege this, right? But they don't even allege the facts like in Marina Pacific. That's a factual difference between this case and Marina Pacific. I detailed allegations about what was physicochemical reactions between something that's sitting on property and something else. That's not enough, we submit. We do not believe Marina Pacific was correctly decided. But this case only has paragraphs five. Yeah. It's almost nonexistent. Paragraphs five, 53, 73, and 75. You can look at them. It was the only paragraphs I could find in the complaint that mentioned physical presence. And all they say is that the physical presence is a physical alteration. That's it. There's no science, there's no explanation of why that would be true or how it could possibly be true. And we submit it's just flat out not plausible. Let me ask you about Marina Pacific. So the court there went out of the way to say that this may be improbable, but under our pleading standard, we're required to take it as true. Of course, the federal courts have a different standard under Iqbal V. Ashcroft. How does that affect the analysis and our consideration of Marina Pacific and its precedential value? So I think by its own terms, Marina Pacific is telling you that this case arising in federal court would be decided differently, even by those judges. We don't agree, it's not for this court to decide, but we don't agree with Marina Pacific's analysis of state pleading standards. We think the case was wrongly decided under state pleading standards, but accepting its own description. And the case literally says they're not allowed to use common sense. It literally says you have to accept allegations however improbable. I submit that neither of those propositions is remotely true under the federal pleading standard that Another Planet itself invokes, citing the Comcast case, which says that under the federal standard, the plaintiff has to, quote, So they have to allege facts plausibly showing a distinct, demonstrable, physical alteration to the property. So we're getting around to what I wanted to ask you. Are you really bottom line asking us to rely on Iqbal that is not plausible, full stop? Not bottom line. We think that makes this case in federal court easier, but to the extent we submit that Marina Pacific is wrongly decided under any pleading standard, we don't think that a plaintiff can establish allegations that would establish that there is a distinct, demonstrable, physical alteration to property, which is what's required under California law. A virus that sits on property on an inert surface doesn't plausibly change the property itself. There's no science. I just asked you if you're asking us to rely on Iqbal and you corrected me. You said not bottom line and then you're proceeding with an answer that sounds to me like Iqbal. So what am I missing? Are you telling me you think it's not plausible? I do think it's not plausible, but I think even under a standard that's more liberal than Iqbal, prior to Iqbal this case would be decided the same way we submit. Clarification of your position. Because it's a conclusory allegation to say that sitting on the property changes the property. It doesn't. I get it. But I want to be clear, it's not just Iqbal. Again, it's the absence of any basis. Is the allegation that the virus has a chemical reaction with the property and changes the property as a result of that chemical reaction? So that's not an allegation you'll find in this complaint. It doesn't exist. Again, I urge you to look at paragraphs 5, 53, 73 and 75. That was the allegation of Marina Pacific and their brief consistently says we have the same allegations as in Marina Pacific. It's just not true. This is a very conclusory physical presence is an alteration with no basis for drawing that inference. But Marina Pacific, we submit, as I've said, itself is not correctly decided because all the one is saying, all the allegations there are saying is there is necessarily when one physical, a tangible item contacts another and remains in contact, of course at the atomic level there's some sort of connection. That's how they stay attached. But that's not a change to the property on which the virus is sitting. Any more than any kind of spill or if you sneeze on a doorknob, what you have is a doorknob with virus on it. Then the virus goes away. It either gets wiped off or it evaporates. The doorknob is still a doorknob. Are you familiar with the memorandum disposition entered by another panel in Taub Group Holdings? Yes. You want to speak to that? I think it supports the position here because that's another case when you asked about the scorecard of cases that addresses physical presence. It's not binding, of course, but they distinguished and purported to say that Marina Pacific, well, they did say, Marina Pacific can be distinguished because of the allegation of property having been disposed. Can you tell me, does that really knock out this case? Does it knock out this case? It does. That is a distinction. There's not an allegation here that they had to dispose of any property. I don't know that Taub Group is a conclusive holding that that's enough. We don't think it is because what's required are... You say that there isn't a... Marina Pacific seems to say quite clearly that it recognizes UTI and it's going the other way. I agree with both points. Marina Pacific, on its own terms, disagrees with UTA. That is descriptively true. It is also true, however, that looking and trying to put the cases all together and see what's really going on, I think it's fair and important to emphasize that one of the things a Marina Pacific looked at and emphasized... There's two things that I think are important to distinguish both this case and maybe Taub Group. One, we've already talked about, you raised, which is that Taub Group read Marina Pacific as emphasizing the point about you had to throw the product away or the property away. It says that it focused on that. Yeah, that's one of the important... I mean, there's two or three things going on in Marina Pacific. I think it did emphasize that when it talks about  Is it the only thing? No, there's a number of things. But if that had not been present in Marina Pacific, I think it's fair to say, to surmise, there might well have been a different result. But the other important point about Marina Pacific, similarly, another, I think, very important part of the analysis, if not necessarily decisive, is its reliance on different policy language that doesn't exist here and I don't believe existed in Taub Group. And that's the Fireman's Fund sort of unique provision for the communicable disease coverage extension. And Marina Pacific absolutely focuses on that. Again, not only on that, but it does have an entire passage analyzing that and explaining why it informs that court's analysis of what that policy language means. That provision... I seem to hear, Mr. Passage, arguing that we shouldn't be reading this insurance policy under a plain meaning, but interpret it based on the reasonable expectations of the insured. And he mentioned the PG&E case. Was there some claim that... Or is there some claim that the language is ambiguous and extraneous? Evidence should be admitted to interpret the language? There is not that claim here. That's the problem with reliance on Yahoo, which the very passage he cites... I can forget about that. I think it's just completely irrelevant. I mean, Yahoo explicitly says we look to reasonable expectations when policy language is ambiguous. And there's nothing ambiguous here. The only disputed question, right, is whether the presence of the virus physically alters property. The language itself, mud pie, Judge Christen's opinion squarely holds what that language means, and there's no ambiguity about it. I heard Mr. Passage say that had the concerts been open, the virus would have come in, but the concerts were closed. The concerts were closed by court orders. I mean, by governmental orders. And that's what the district court, what Judge Chhabria found, right? Yes. What's your position on that? I mean, our position is that there's no basis for causation. You know, there's a number of problems here. That's not the one we develop at the most length, but it's absolutely true that no matter what happened to any physical property, their venues were not going to be open because the government wasn't letting them be open. What about the efficient proximate cause rule? So one of the problems, I think, with focusing too much on that causation issue is there are efficient proximate issues that have not been briefed and developed on appeal. Right. And so we think it's much... It was addressed below. The court did say, as Judge Bey is pointing out, that there's a causation problem. We just haven't developed the efficient proximate cause issues. I don't think they're relevant. I think we went under those, but I concede that they're not briefed here. Okay, fair enough. And I think it's much cleaner and easier just to apply all the precedents saying that virus sitting on inert surface doesn't change the property itself. I just want to go back to... Why not simply affirm on the same ground that Judge Kshabra affirmed? That would be fine with us. There's a number of bases, I think, that he correctly dismissed the case. Can I back up? I want to give you both a chance to address this. When we ruled on mud pie, there were indications from the California court about what we thought the California court would do with that, and we went forward. Even though we knew it was going to affect a lot of cases. Fast forward a year later, in August of this year, we had the same issues in Washington state. Washington state didn't have so many interim rulings from interim courts, and it wasn't quite as clear, and it was clear, though, that the Washington court was going to be looking at that very shortly, and we waited. What kind of indication do we have that the California court may be looking at this? I don't know what indications we have that they may be looking at it. Cases involving the presence of the virus. What we know is they have many, many opportunities. They declined an opportunity in UTA. Marina Pacific is pretty recent. They declined to take another look at Inns-by-the-Sea, UTA, that line of cases, but this is a pretty recent development. We take seriously that we've got California courts pointing fingers in opposite directions, so should we wait? I would propose you do not wait because as this court, in footnote seven, we cite the Deutsche Bank precedent, again, not published, but just sort of this court's practice, I think, is to say that when the California Supreme Court, when this court is aware that the California Supreme Court is aware of an issue and has and will have opportunities to address it, I think the most sensible course is just to continue down the course this course had been, and if and when the California Supreme Court... The problem with that, sir, is there's a lot of cases lined up behind this. This is a really consequential ruling for many, many folks, so doesn't that change our equation? I don't think so, with respect, Your Honor, because, again, also what matters is predicting what we think the California Supreme Court will do based on existing California precedents, and I don't think Marina Pacific, by itself, establishes any real controversy given the force of the UTA decision, given Apple Annie, given Inns-by-the-Sea. Meaning it's such an outlier? Yes. Or because of the standard? Well, I... Because of your Iqbal argument? Well, I think under California law, right, the Iqbal, it's going to be a question about what the California pleading standard... And about the standard. Yeah, we think they got the California pleading standard wrong under any pleading standard. We think the case is incorrectly decided, but it's not just Marina Pacific against these three or four other state California decisions. Well aware of that. Yeah, I understand. Right, the national. It's such an outlier nationally. It's much more than the 76%. But you started your argument by conceding you haven't... When you say it's such an outlier nationally, that's true if we're talking about the mud pie line of cases, but this is a different animal. Well, I didn't mean to concede that there's not other physical presence cases. There's all kinds of physical presence cases. Point. I asked you for the scorecard and you said you hadn't kept that subset of the scorecard, and I haven't either. Yeah, I just couldn't list all the cases, but I know there are many, many, many, many cases out there holding that physical presence alone, just like UTA and just like Apple Annie. That's the part I know, but I was asking you a different question. Just to be clear to make sure we're communicating, I was asking you about understanding that the vast majority of cases have gone the same way on mud pie, right? Do we know what the outcome has been? How many cases have lined up on the way Marina Pacific lined up? That's what I'm asking. Even though I agree with Marina Pacific, almost none. Know how many? I think it's on an appellate level. I think you've got Cajun Conti in Louisiana, which is under review. You've got the sharply divided decision in Huntington Ingalls in Vermont, which is three to two. Is that a presence case? Yes. I agree with Mr. Patchett. That one is a presence case. The one you may be thinking of that's not a presence case is Ungarian, which just came down. Also divided in the Pennsylvania Superior Court, their intermediate appellate court. Totally confusing decision because it's irreconcilable with itself. Literally, the judges seem to disagree with themselves. That case is one of these loss of use cases like mud pie. You really only have... That's my concern. This seems to be a very new theory to me. The other cases read alike. This one reads differently. It presents differently. That's my concern, but I've certainly... You've been really patient with my questions. Thank you. I guess I'll end with the proposition. I submit that in that respect, it is not a new case. It is not different. It has been... Your position on that is clear. Okay. There are no further questions. Thank you so much. Thank you very much. Thank you. You have a few seconds left for rebuttal. 42 seconds. Paragraph 77 is not on information and belief, Your Honor. The paragraphs that we think are most relevant in assessing our claims are 53 through 77. We cite science in the footnotes. We make allegations of physical presence and it's not just on surfaces. It is in the airspace which is why we think Armstrong controls. On your question about the California Supreme Court, we're frankly mystified that they haven't done something. That's why we suggested the possibility of certifying the issue to them. They will duck it if they want or perhaps they will take it. On Tau, petition for rehearing was filed yesterday. That's another one of my cases along with a request to stay in deference to what's going on in New York. As far as the split of cases on direct physical damage, there's a handful that are specific to that. I do think it's a split. That is Huntington Ingalls in spades. Thank you.
judges: BEA, IKUTA, CHRISTEN